UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 1:19-10264-PBS |
| | ) | |
| YANNICK MINANG, | ) | |
| | ) | |
| Defendant | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Acting United States Attorney, by and through the undersigned Assistant United States Attorney, hereby respectfully submits this memorandum in connection with the sentencing of the defendant in this case, Yannick Minang ("Minang" or "Defendant").  As set forth below, the government recommends a sentence of 52 months incarceration (to be served concurrently with the remaining part of a sentence from an earlier case), 36 months supervised release, and a forfeiture money judgment in the amount of $552,445.17.

I.      **FACTUAL BACKGROUND**

The Pre-sentence Investigation Report ("PSR") accurately summarizes Minang's offense conduct, and the government will not recite it here.  PSR ¶¶ 7 – 33.

II.     **THE ADVISORY SENTENCING GUIDELINES**

In calculating the Defendant's offense level under the sentencing guidelines, the PSR groups the two counts of conviction (wire fraud and money laundering conspiracy) together, and uses the higher offense level for the money laundering conspiracy count.  PSR ¶¶ 38 – 39.  The PSR calculates the base offense level for the money laundering conspiracy count as 20, based on a money laundering base of 6; applies a 2-level enhancement for sophisticated laundering; applies a 2-level enhancement for the defendant's conviction under 18 U.S.C. § 1956; applies a

3-level enhancement for the defendant's role as a manager or supervisor; applies a 3-level

enhancement for committing this offense while on release; and finally applies a 3-level reduction

for the defendant's acceptance of responsibility, resulting at a total offense level of 27.  *Id.* ¶ 40 –

52.  With the defendant's criminal history category of II, this results in a guidelines sentencing

range ("GSR") of 78 – 97 months.

There is a plea agreement in this case.  ECF No. 73 ("Plea Agreement").  In the Plea

Agreement, the parties calculate the defendant's total offense level to be 28, one level higher

than the PSR, with the key difference being that the parties calculate the base offense level for

the money laundering conspiracy count as 21, using the base offense level of 7 for the wire fraud

count, *i.e.*, the "underlying offense" that generated the laundered funds.  This difference is

highlighted in the chart below:

| USSG | Gov't. | PSR |
|---|---|---|
| **§ 2B1.1(a)(1) – *Wire Fraud Base*** | 7 | 7 |
| **§ 2S1.1(a)(1) – *Money Laundering Base*** <br> • *Gov't using base offense level of 7 based on § 2B1.1(a)(1)* <br> • *PSR using base offense level of 6 based on § 2B1.1(a)(2)* | 7 | 6 |
| § 2B1.1(b)(1)(H) – *Loss (> $550,000)* | +14 | +14 |
| § 2B1.1(b)(10) – *Sophisticated means* | +2 | +2 |
| § 3B1.1(b) – *Role as manager or supervisor* | +3 | +3 |
| § 2S1.1(b)(2)(B) – *Conviction for § 1956* | +2 | +2 |
| § 3C1.3 – *Offense while on release* | +3 | +3 |
| Adjusted Offense Level (Subtotal) | 31 | 30 |
| § 3E1.1(a) and (b) – *Acceptance of Responsibility* | -3 | -3 |
| **Final Adjusted Offense Level** | 28 | 27 |

The government has objected to the PSR on this point.  As set forth below, the plain

language and purpose of § 2S1.1 support using the wire fraud base offense level of 7 as the

starting point for the calculation of the money laundering conspiracy offense level here.  As the

PSR points out, in a related case involving the same scheme and Defendant's co-conspirator,

Bintu Toure, Judge Wolf rejected the Probation Office's position and held that the correct base offense level is 7. *See* PSR fn 1; *see also United States v. Toure*, 19-cr-10369-MLW, Sentencing Tr. at 9 – 14 (Apr. 16, 2021) (ECF No. 43) (excerpt attached as Ex. 1). As the Court noted in *Toure*, using the wire fraud base as the starting point is supported by the First Circuit's reasoning in *United States v. Cruzado-Laureano*, 440 F.3d 44, 48 (1st Cir. 2006); decisions from Ninth and Sixth Circuits; and the Sentencing Commission's discussion of the 2001 amendment that created the current money laundering guideline. The same reasoning applies here. It is the same scheme and the same charge; there is no reason why the starting point for the base offense level for Minang should be any different than his coconspirator's.

A.  Section 2S1.1 Requires Direct Money Launderers To Be Punished More (Not Less) Than Those Who Solely Commit the Underlying Offense

In adopting § 2S1.1, the Commission made clear that its express purpose was to ensure that "*all direct money launderers will receive an offense level that is one to four levels greater than the Chapter Two offense for the underlying offense.*"[1] *See* Guidelines Supp. to Appx. C ("Commission Policy"), amend. 634, at 230 (Nov. 1, 2001), *available at* https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2001/manual/APPCSUPP.pdf ("[T]his amendment provides for three alternative enhancements . . . [that] are designed to (1) ensure that all direct money launderers receive additional punishment for committing both the money laundering offense and the underlying offense...").

To accomplish this mandate, the Commission directs courts to calculate the underlying offense for direct money launderers as follows:

---

[1] In adopting Section 2S1.1, the Commission defined direct money launders to be offenders, like Minang, "who commit or would be accountable . . . for the underlying offense which generated the criminal proceeds." Commission Policy at 229.

> For direct money launderers . . . subsection (a)(1) sets the base offense level at the offense level in Chapter Two (Offense Conduct) *for the underlying offense* (*i.e.*, the base offense level, specific offense characteristics, cross references, and special instructions for the underlying offense).

Commission Policy at 229 (emphasis added); *see also* U.S.S.G. § 1B1.5(b)(1) ("An instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline.").

In other words, § 2S1.1(a)(1) requires an independent calculation using the complete substantive guideline for the underlying offense – including any instructions or references contained therein – before turning to the money laundering guideline. *See Cruzado-Laureano*, 440 F.3d at 48 (holding that § 2S1.1(a) requires that "before considering what money-laundering adjustments to apply to [defendant]'s sentence, the court first had to calculate the sentence as it would have applied to the [underlying] extortion counts *standing alone*, making reference to [the underlying extortion guideline]" before returning to § 2S1.1) (emphasis added); *see also United States v. Menendez*, 600 F.3d 263, 267 (2d Cir. 2010) ("The total Guidelines offense level for such 'underlying offense,' *after being independently calculated* by applying all appropriate adjustments, and considering any relevant conduct under U.S.S.G. § 1B1.3 . . . is then used as the base offense level for money laundering . . . .") (emphasis added and citation omitted). As the Seventh Circuit aptly stated: "[a]dding levels for 'all' direct launderers is possible only if . . . § 2S1.1(a)(1) plugs the full offense level for the substantive guideline into the 'base' level for money laundering." *United States v. Hodge*, 558 F.3d 630, 637 (7th Cir. 2009).

Here, when analyzing the fraud offense as a standalone count, the PSR correctly calculates the base offense level for the underlying offense as 7, because Minang was convicted of an offense "referenced to this guideline" [*i.e.*, wire fraud] and that offense has a statutory maximum term of imprisonment of 20 years or more. *See, e.g.*, PSR ¶ 39. Because the loss

4

amount is more than $550,000, but not more than $1,500,000, the offense level for the fraud is increased by 14 levels to 21.

Following the Commission's directive, this offense level of 21 should then be used as the "base" level for money laundering.  *See, e.g.*, *Cruzado-Laureano*, 440 F.3d at 48 (holding that the district court, after determining the underlying offense level standing alone, "was only then required to return to 2S1.1 (and specifically to 2S1.1(b)) to determine if further adjustments were necessary under that provision").  Accordingly, here, the money laundering base offense level – *i.e.*, 21 – should then be increased by 2 levels since the defendant was convicted of violating 18 U.S.C. § 1956.  *See, e.g.*, *United States v. Rushton*, 738 F.3d 854, 858 (7th Cir. 2013) ("The offense level for money laundering in violation of 18 U.S.C. § 1956 (as in the present case) levitates from the underlying offense (the crime that produced the money that the defendant laundered) by adding 2 levels to the total offense level for that offense.") (parentheticals in original).  To this, the other enhancements are added, resulting in an adjusted offense level of 31, which, after a 3-level downward adjustment for acceptance of responsibility, results in a total offense level of 28.

B.  The PSR's Money Laundering Guideline Calculation Has Been Expressly Rejected

The PSR suggests that – even though the correct base offense level for the underlying offenses would be 7 if calculated independently, *see* PSR ¶ 39 – since Minang was a direct money launderer his base offense level should be 6.  PSR ¶ 40.  To reach this conclusion, rather than calculating the underlying offense level standing alone, the PSR cross references the money laundering statute when calculating the underlying fraud offense, as detailed below:

> Pursuant to §2B1.1, Application Note 2(A), for purposes of subsection (a)(1), an offense is 'referenced to this guideline' if (i) this guideline is the applicable Chapter Two guideline specifically referenced in Appendix A for the offense of conviction, as determined under the provisions of § 1B1.2; or in the case of a conviction for

5

conspiracy, solicitation, or attempt to which § 2X1.1 applies, this guideline is the appropriate guideline for the offense the defendant was convicted of conspiring, soliciting, or attempting to commit.  The offense of conviction in this case is Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h).  The Statutory Index at Appendix A references USSG §2S1.1 only for this offense of conviction, so neither subsection (i) or (ii) to Application Note 2(A) are applicable.

*Id.* ¶ 41.

Courts have rejected this approach, including this Court in the *Toure* case.  *See, e.g.*,

*United States v. Salado*, 590 Fed. Appx. 692, 693 (9th Cir. 2015) (base offense level 7 where

defendant convicted of money laundering offense and an offense referenced to § 2B1.1); *United*

*States v. Nikolovski*, 565 Fed. Appx. 397, 401-02, n.4 (6th Cir. 2014) (same); *United States v.*

*Mirzoyan*, 2017 WL 1501394, at *18 (S.D.N.Y. Apr. 26, 2017) (same).

The reason is clear:  § 2B1.1's entire offense guideline – including using the fraud (not

money laundering) statute when applying the instructions to determine the "referenced to this

guideline" prong of Application Note 2(A) – is the only way to independently calculate the

underlying offense level.  *See Hodge*, 558 F.3d at 637 (holding that, while "[u]sing the guideline

(including its adjustments) for one offense as the 'base' level for another [*i.e.*, § 2S1.1(a)(1)] is

an unusual approach," the Commission has plainly explained that courts must use "the complete

substantive guideline" including all "cross references, and special instructions *for the underlying*

*offense*.") (emphasis and brackets added).[2]

---

[2] In its response to the government's objection, *see* PSR at 34, the Probation Office relies on *United States v. Hallahan*, 756 F.3d 962 (7th Cir. 2014), *United States v. Zaranek*, 428 F. Supp. 2d 697 (E.D. Mich. 2006), and *United States v. Abdelsalam*, 311 F. App'x. 832, 845 (6th Cir. 2009).  As Judge Wolf explained in *Toure*, these cases are "not persuasive on this point." *See* Ex. 1 at 12-13.  In *Hallahan*, the court adopted Probation's approach, but the government conceded the point and the Seventh Circuit did not analyze the issue.  756 F.3d at 979.  And as the Sixth Circuit pointed out in *Nikolovski*, the court in *Abdelsalam* used a based offense level of 6 instead of 7 only because the underlying offense did not carry a maximum sentence of 20 years or more.  *Nikolovski*, 565 Fed. Appx. at 403 n.4.  For the same reason, *Zaranek* is unavailing: the

Moreover, the PSR's calculation runs contrary to the approach taken by the Probation Office in previous cases in this district involving a direct money launderer. *See, e.g., United States v. Patel*, No. 19-cr-10381-LTS (Jan. 13, 2020), PSR ¶ 32 (recommending a fraud base offense level of 7, not 6, when calculating the base offense level for a direct money launderer); *United States v. Eze*, 19-cr-10352-LTS (Dec. 30, 2019), PSR ¶ 37 (same); and *United States v. Abell*, 17-cr-10332-NMG (Jan. 4, 2019), PSR ¶¶ 41-42 (same). There has been no intervening change in the law that would justify changing this practice now.[3]

For these reasons, the government submits that Minang's total offense level, correctly calculated, is 28. This results in a GSR of <u>87 - 108 months</u>.

**III.    <u>3553(a) FACTORS</u>**

In determining a defendant's sentence, the Court must consider the Sentencing Guidelines and determine the advisory sentencing guideline range, which, once calculated, establishes the court's "starting point" or "initial benchmark." *See Gall v. United States*, 552 U.S. 38, 49 (2007). Next, the court should consider the various factors set forth in 18 U.S.C. § 3553(a).

Here, the government's recommendation is <u>52 months</u> to be served concurrently with Minang's earlier sentence of 46 months in *United States v. Minang*, 17-cr-10376-FDS ("*Minang*

---

underlying crime there carried a maximum penalty of only 10 years, in contrast to the wire fraud charges here (which carry a maximum penalty of 20 years). 428 F. Supp. 2d at 700.

[3] The Probation Office has taken this different approach (*i.e.*, starting with a base offense level of 6) in more recent cases. *See, e.g., United States v. Janavs*, 19-cr-10080-12-NMG. And other sessions of this Court have agreed with that approach. *See, e.g., Janavs*, Sentencing Tr., ECF No. 872 at 9 (adopting base level of 6, but describing calculation as "academic and irrelevant to the ultimate sentence that will be imposed" by the Court); *United States v. Hodge*, 19-cr-10080-11-NMG, Sentencing Tr., ECF No. 840 at 15 (same); *United States v. Kapoor*, 16-cr-10343-7-ADB, Sentencing Tr., ECF No. 1175 at 6 (adopting base level of 6 based on "probation's rationale," where GSR was 151 – 188 months).

*I*"), with the intention that Minang serve <u>33 additional months</u> beyond the sentence in *Minang I*. (This is based on the understanding that Minang has served approximately 27 months of his 46 month sentence, leaving another 19 months on that sentence; those remaining 19 months would be served concurrently with the sentence imposed in this case.)  In arriving at this recommendation, the government has taken all relevant factors into account, including but not limited to the nature of the offense, the defendant's history and characteristics, and the need to afford adequate deterrence.  These factors are considered below.

*First*, the government's recommendation appropriately reflects the nature and seriousness of the offense.  *See* 18 U.S.C. § 3553(a)(2)(A).  Minang willfully took part in a scheme to steal money from innocent victims—business people who thought they were dealing with real businesses.  Those victims thought they were responding to legitimate emails, and wiring money to accounts based on what they assumed were legitimate invoices.  But the whole thing was a sham.  In total, victims wired over $600,000 to fraudulent bank accounts that were controlled by Minang and his co-conspirators.  PSR ¶¶ 10 – 11, 32.[4]  That was Minang's role in this scheme: providing the fraudulent bank accounts so that the fraud proceeds could be received, laundered, and sent on to coconspirators overseas (after Minang took his cut). To carry this out, Minang recruited at least three other people to open bank accounts, and together they opened fraudulent accounts at three different banks.  Minang played a managerial role, directing the actions of the others he recruited.

The impact of Minang's actions on his victims is significant.  "Victim Company A" has submitted a victim impact statement which describes "a nightmarish experience regarding [the]

---

[4] As noted in the PSR, in February 2020, $76,673.75 that had been frozen by TD Bank was returned to Victim Company A from one of the fraudulent accounts, thus lowering the total loss amount to $552,445.  PSR ¶ 34.

fraudulent behavior." *See* Exhibit 2. The coconspirators were "able to intercept emails [Victim Company A] sent to a Brazilian Chicken Producer and [were] able to direct the payments to [Minang's] accounts." This victim identifies $283,500 that was paid to a fraudulent account that Minang and his coconspirators had opened and controlled.[5] In addition to the significant out-of-pocket losses, this victim also identifies the loss of business, as "[p]romises made to end buyers were not fulfilled and caused significant embarrassment to us and loss of revenue." *Id.* This underscores the seriousness of the offense, and it is reflected in the government's recommendation of additional jail time for Minang.

*Second*, Minang's history and characteristics, as set forth in the PSR, support the government's recommendation. *See* 18 U.S.C. § 3553(a)(1). This is the second time that Minang has been convicted of laundering the proceeds of wire fraud, using fraudulent bank accounts to steal money from victims. Indeed, Minang committed *this* offense while he was on pretrial release, awaiting sentencing in *Minang I*. In that case, Minang used his own name to open the sham accounts, and was caught on camera in the bank. This time, Minang recruited coconspirators to go into the bank, and directed their actions from afar. Considered against this backdrop, Minang's conduct calls for a sentence that includes significant additional jail time.

*Third*, the government's recommended sentence will "afford adequate deterrence to criminal conduct." *See* 18 U.S.C. § 3553(a)(2)(B). It will deter Minang from committing future crimes, so that his criminal conduct ends here. Importantly, the recommended sentence will deter others who might be tempted by so-called "easy money" from opening the bank accounts that make such BEC schemes possible. Those who use the Internet to exploit the trust of

---

[5] This victim impact statement also identifies a payment for a second shipment of $565,110, but that is not included among the charged conduct.

innocent businessmen and women – and all those who conspire with them – should know that when they get caught, they will be held accountable and face serious consequences.

Given the prevalence of schemes like the one charged here, general deterrence is critical. Statistics published by the FBI's Internet Crime Complaint Center ("IC3") in 2019 show that BEC scams "continue[ ] to grow and evolve, targeting small, medium, and large business and personal transactions."  IC3 Alert Number I-091019-PSA, available at: https://www.ic3.gov/Media/Y2019/PSA190910.  The IC3 reported that between June 2016 and July 2019, over 166,000 victims collectively reported over *$26 billion* in domestic and international losses.  *Id.*  And the threat is growing: "Between May 2018 and July 2019, there was a 100 percent increase in identified global exposed losses."  *Id.*  The sentence imposed in this case should put BEC scammers on notice: if you get caught participating in such schemes and laundering the proceeds, you will face serious consequences.

## CONCLUSION

For these reasons, taking all relevant factors into account, the government recommends that the Court sentence the Defendant to a term of imprisonment of 52 months to be served concurrently with his sentence in *Minang I*, such that the Defendant will serve an additional 33 months in prison, followed by 3 years of supervised release.

Respectfully submitted,

NATHANIEL R. MENDELL,
Acting United States Attorney

By:     */s/ William B. Brady*
        William B. Brady
        Assistant U.S. Attorney

Dated:  October 22, 2021

CERTIFICATE OF SERVICE

I hereby certify that, on the below date, this document was filed through the ECF system which sends copies electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ William B. Brady*
William B. Brady
Assistant U.S. Attorney

Dated:  October 22, 2021